6-96-028-CV Long Trusts v. Dowd 



















In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00128-CV
______________________________



IN RE:
LEONARD RAY NAYLOR





Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Original Mandamus Proceeding





Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross



O P I N I O N

Â Â Â Â Â Â Â Â Â Â Leonard Ray Naylor has filed a petition for writ of mandamus in which he asks this
Court to order Judge Don L. Jarvis to vacate his order granting Theresa Naylor's objection
to visiting judge, to enter an order overruling the objection to visiting judge, and to proceed
as the judge over the case. 
Â Â Â Â Â Â Â Â Â Â The underlying case involves the divorce of the parties and, in this particular context,
an ongoing dispute over a motion to hold Theresa in contempt for failing to pay child
support. Judge Ray Grisham, of the 336th Judicial District Court, was the first judge to
preside over the proceedings. Judge Jarvis was assigned to that court
for the period of 5 days beginning 7/14/03, providing that the assignment
shall continue after the specified period of time . . . to complete trial of any
case or cases begun during this period, and to pass on motions for new trial
and all other matters growing out of cases tried . . . during this period.

Â Â Â Â Â Â Â Â Â Â The relevant portions of the time line are as follows:
February 3, 2003:Order to Theresa to show cause why she should not be held
in contempt
Â 
May 16, 2003:Evidence heard, contempt proceeding dismissed per order
signed by Judge Grisham



Â 
June 26, 2003:Order assigning Judge Jarvis to 336th Judicial District Court
Â 
June 30, 2003:Leonard files motion to set aside dismissal and to reinstate
Â 
July 18, 2003:Order reinstating case signed by Judge Jarvis
Â 
August 22, 2003:Objection to visiting judge filed; Judge Jarvis grants objection

Â Â Â Â Â Â Â Â Â Â Leonard contends that, because Judge Jarvis' granting of the objection was a clear
failure to observe and apply a mandatory statute, mandamus is the appropriate remedy. 
Specifically, he contends that, because Tex. Gov't Code Ann. Â§ 74.053(c) (Vernon 1998)
requires any objection to an assigned judge to be made before the first hearing in the case,
and because the objection was untimely because it was not made until after Judge Jarvis
had already conducted a hearing and ruled on the proceeding, the judge improperly
applied a mandatory statute. Thus, he contends, Judge Jarvis should continue as the
sitting judge in the case, should enter an order overruling the objection, and proceed under
the order of assignment.
Â Â Â Â Â Â Â Â Â Â In response, Theresa takes the position that, because Leonard did not file a motion
for new trial or for reconsideration of the dismissal within thirty days from the date the
dismissal was granted, the trial court lacked jurisdiction to take any action after its plenary
power period expired. 
Â Â Â Â Â Â Â Â Â Â Theresa's initial position is essentially that any attempt to undo the dismissal of the
contempt proceeding either had to be pursued by appeal or by the address of a timely
motion to the trial court and that, since neither occurred, everything that happened after
the trial court's plenary power expired is essentially a nullity. Decisions in contempt
proceedings are not appealable. Ex parte Williams, 690 S.W.2d 243, 243 n.1 (Tex. 1985); 
Ex parte Cardwell, 416 S.W.2d 382, 384 (Tex. 1967). Similarly, an order finding a party
not in contempt is not a final, appealable judgment. Norman v. Norman, 692 S.W.2d 655,
655 (Tex. 1985). We have found no cases, and have been directed to no cases, that apply
Tex. R. Civ. P. 329(b) to rulings made in contempt proceedings. Thus, the plenary power
constraints of the rule would not apply in this case.
Â Â Â Â Â Â Â Â Â Â As a general rule, a trial court retains plenary power over its interlocutory orders until
a final judgment is entered. Fruehauf v. Carrillo, 848 S.W.2d 83, 84 (Tex. 1993). A trial
court thus has the inherent authority to change or modify any interlocutory order until its
plenary power expires. Mendez v. San Benito/Cameron County Drainage Dist. No. 3, 45
S.W.3d 746, 754 (Tex. App.âCorpus Christi 2001, pet. denied). Further, except as
authorized by the Legislature for specific categories of interlocutory orders, such orders are
by their very nature not appealable.


 
Â Â Â Â Â Â Â Â Â Â This situation arguably requires a different result because, by its very nature, this
type of contempt proceeding, though part of the continuing saga of the divorce, is a
separate order, and finality will not accrue on entry of some final judgment. That position,
however, flies in the face of the cases holding categorically that contempt may be
addressed only through habeas or mandamus in the proper circumstances. We decline
the invitation to treat this situation differently. 
Â Â Â Â Â Â Â Â Â Â Thus, appeal was not an available remedy in this case.
Â Â Â Â Â Â Â Â Â Â We now turn to the issue raised by the petition for writ of mandamus: whether the
visiting judge committed error, subject to correction by mandamus, by removing himself
from the case based on Theresa's objection to him sitting as a visiting judge. The real
party in interest filed an objection to Judge Jarvis under Section 74.053, at a time after
Judge Jarvis had signed an order reinstating the contempt proceeding. The order states
it was granted after hearing the evidence and argument of counsel. 
Â Â Â Â Â Â Â Â Â Â If the assigned judge refuses to remove himself or herself after a party timely files
an objection under Section 74.053, that judge's subsequent orders are void and the
objecting party is entitled to mandamus relief without a showing it lacks an adequate
remedy by appeal. Dunn v. Street, 938 S.W.2d 33, 34-35 (Tex. 1997); Flores v. Banner,
932 S.W.2d 500, 501 (Tex. 1996). The denial of a timely Section 74.053 objection is a
proper subject of mandamus. In re Flores, 53 S.W.3d 428, 430 (Tex. App.âSan Antonio
2001, orig. proceeding). Under the statute, to be timely and thus make the recusal
mandatory, an objection must be filed before the judge presides over any hearing. Tex.
Gov't Code Ann. Â§ 74.053 (Vernon 1998); In re Canales, 52 S.W.3d 698, 702 (Tex. 2001). 
Whether formal notice of the appointment was given is not relevant to this determination. 
See Canales, 52 S.W.3d at 702.
Â Â Â Â Â Â Â Â Â Â The objection was filed August 22, over thirty days after Judge Jarvis signed the
reinstatement order following a hearing. The objection was not timely, and thus Judge
Jarvis was not required to remove himself from the case. 
Â Â Â Â Â Â Â Â Â Â The question before this Court, however, is whether some mandatory reading of the
statute required Judge Jarvis not to remove himself, but instead to stay on the case as the
sitting judge when the objection was untimely. 
Â Â Â Â Â Â Â Â Â Â Mandamus will lie only to correct a clear abuse of discretion or the violation of a duty
imposed by law when there is no adequate remedy at law. Johnson v. Fourth Court of
Appeals, 700 S.W.2d 916, 917 (Tex. 1985). The writ will issue to compel a public official
to do a ministerial act, that is, one that is clear and definite and does not involve the
exercise of discretion. Anderson v. City of Seven Points, 806 S.W.2d 791, 793 (Tex.
1991); Benavides v. Garcia, 687 S.W.2d 397, 398 (Tex. App.âSan Antonio 1985, orig.
proceeding). A writ of mandamus will not issue to compel a public official to perform an
act which involves an exercise of discretion. Anderson, 806 S.W.2d at 793; Benavides,
687 S.W.2d at 398. When a statute delineates the act an official is to perform with
sufficient certainty so nothing is left to the exercise of discretion, the case involves only
performance of a ministerial act and is subject to mandamus. See Anderson, 806 S.W.2d
at 793.
Â Â Â Â Â Â Â Â Â Â This is the opposite of the usual situation. If the objection had been timely, and if
Judge Jarvis had refused to remove himself from the case, he would be in violation of a
mandatory statute and mandamus would lie. In this case, regardless of whether the
objection was timely, the statute does not require Judge Jarvis to refuse to remove himself. 
Even if he did misunderstand the import of Canales and the statute, Leonard has directed
this Court to no mandatory language that would require Judge Jarvis to deny the motion
and remain in place as the trial judge. In the absence of the violation of a mandatory duty,
mandamus will not lie.
Â Â Â Â Â Â Â Â Â Â We deny the petition.
Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â October 29, 2003
Date Decided:Â Â Â Â Â Â Â Â Â October 30, 2003



so-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") f1;
 mso-first-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") f2;
 mso-first-header:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-09-127-CR%20Louis%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->











 
 
 
 
 
 
 




Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

Â 

 In
The

   Court
of Appeals

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Sixth
Appellate District of Texas at Texarkana

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  No. 06-09-00127-CR

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ______________________________

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  COREY DON LOUIS,
Appellant

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  V.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  THE STATE OF TEXAS, Appellee

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 


Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  On Appeal from the 336th
Judicial District Court

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Fannin County, Texas

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Trial
Court No. 22697

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Before Morriss, C.J.,
Carter and Moseley, JJ.

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Opinion by Justice Moseley








Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  O P I N I O N

Â 

Â Â Â Â Â Â Â Â Â Â Â  This
is an appeal by Corey Don Louis of his Fannin County jury conviction for
capital murder in the death of two-year-old Teddy Lawrence.[1]

Â Â Â Â Â Â Â Â Â Â Â  Because
there was legally insufficient evidence that Louis intentionally or knowingly
caused the death of the child, we reverse the capital murder conviction and
acquit him of that charge.Â  Due to jury
charge error, we remand the case to the trial court for trial on the lesser-included
offenses included in the jury charge.

I.Â Â Â Â Â Â Â Â Â  Facts of the Case

Â Â Â Â Â Â Â Â Â Â Â  The
story of the death of the child had its genesis when Teddy and his four-year-old
sister, Beth, rose during the night and made a very big mess in the kitchen of
their home, spreading food (including mustard), dog food, and household
chemicals on the floor. Â This was not the
first time the two children had performed these acts of domestic vandalism.

Â Â Â Â Â Â Â Â Â Â Â  The
children resided with their mother, Danielle Cuba, and her boyfriend, Louis,
the appellant here. Also living in the house were LouisÂ son, John (fourteen at
the time), and CubaÂs infant son.Â  At the
time of the incident here, LouisÂ six-year-old daughter, Meg, was staying with
them during spring break. 

Â Â Â Â Â Â Â Â Â Â Â  On
the Saturday of TeddyÂs death, Cuba arose quite early in the morning, being the
first of the adults to awake. Â Upon
discovering the mess the children had made during the night, she woke up Louis
and asked him to deal with the children as she commenced cleaning.Â  Although Cuba did not say she explicitly told
Louis to discipline or beat the children because of their offense, there seemed
to be a tacit understanding to that effect.Â 
Thus began what can only be described as a horrendous and excessive
discipline session to punish the two children for their misconduct. 

Â Â Â Â Â Â Â Â Â Â Â  Louis
engaged in three rounds of beatings of the children with a belt, primarily on
their buttocks.Â  First, he whipped the
children shortly after he and Cuba awoke. Â Cuba testified that at some point, Louis sat
down next to her, then said he was not yet tired, and so he got up and resumed
his beatings.Â  Louis then left for work,
instructing that the children were to stand up facing a wall until he
returned.Â  However, having apparently
forgotten something he expected to take, Louis returned inside the house to
discover that Teddy was not standing and facing the hallway wall as instructed
(the child was lying on the floor and appeared to be asleep).Â  Seeing that Teddy was not standing against
the wall as instructed, Louis whipped Teddy a third time. Â According to the testimony of the child, Meg,
during this last beating, Louis said, ÂYou should have been sleep [sic] when
you was [sic] making that big mess.Â  DonÂt
try to be sleep [sic] now.Â Â When Louis
finally did leave for work, he instructed Cuba to make the children continue
standing and facing the wall until he returned, when he would resume beating
them.Â  

Â Â Â Â Â Â Â Â Â Â Â  Meg
also described some of LouisÂ beatings of the children as ÂhardÂ and some as Âsoft.ÂÂ  Her description of the beatings corroborated
LouisÂ own description of holding the children by an arm and beating them on
their posteriors with a belt.Â  Meg
further testified that Louis called them very coarse names during this time and
said, ÂIÂm [not] going to stop whipping you until I go to work.ÂÂ  Meg said that Teddy and Beth both had
difficulty staying on their feet and kept falling down.Â  

Â Â Â Â Â Â Â Â Â Â Â  After
Louis left for work, Teddy continued to be unable to stand. Â At some point, he hit his head; there is
conflicting evidence on how this happened.Â 
Meg said that the boy was crying and trying to hold on to CubaÂs leg; in
a move to disengage the child, she flung the boy away, causing him to hit his
head Âhard.ÂÂ  John, LouisÂ
fourteen-year-old son, said that when Cuba whipped Teddy, the boy fell back and
hit his head on a board on the floor.Â 
Cuba, for her part, admitted kicking the child in the head.Â  Meg also said that Cuba held a hot curling
iron next to TeddyÂs skin, but Cuba denied having done this and the medical
examiner found no evidence of burns on TeddyÂs skin.Â  

Â Â Â Â Â Â Â Â Â Â Â  CubaÂs
disciplinary acts culminated in tying TeddyÂs wrists to a clothes rod and
hanging the boy in a closet when he was unable to remain standing. Â Meg said that TeddyÂs feet struggled to find a
stool in the closet and that he kicked about while trying to get his feet on
the stool.Â  Cuba initially denied hanging
him so high his feet did not touch the floor, but eventually she conceded that
he might have been in such a position.Â  Cuba
maintained that she only left the boy hanging in the closet for five minutes at
most, then let him down and put him to bed and that Teddy was still breathing
when she put him to bed.Â  Cuba also
admitted that although Teddy suffered from asthma and was supposed to receive
treatments for the malady twice per day, she had not given him his medication
or treatment the two days prior to the incident date.Â  After Cuba removed Teddy from the closet, she
put the children to bed and laid down herself.Â 
Sometime around 8:30 that morning, Cuba awoke and found Teddy stiff in
bedÂÂrigor mortis had set in. Â She called
Louis at work, then called 9-1-1.Â  When
emergency medical technicians (EMT) arrived, they determined that the child was
already dead and took his body to the local (Bonham) hospital. Â When one EMT heard Cuba say she thought the
children may have ingested some Âblue stuff,Â he suggested they return to the
house for the rest of the children as a precaution against possible
poisoning.Â  By this point, Louis had
returned from his job in Sherman back to the house in Bonham, where he was met
by a Bonham police officer, who refused to allow Louis in the house. 

Â Â Â Â Â Â Â Â Â Â Â  In
a video-recorded statement to law enforcement, although Louis first maintained
that he had only spanked the children with his hand, he later admitted during
the interview that he had employed a belt in the beatings.Â  Nevertheless, he was adamant he did not beat
the children sufficiently hard to cause the extensive subcutaneous hemorrhaging
suffered by Teddy and the injuries (later diagnosed as rhabdomyolysis[2])
presented by BethÂs wounds.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  At
the hospital, Louis told a Child Protective Services (CPS) investigator, ÂGod
knows we didnÂt do nothing [sic] wrong.ÂÂ 
The investigator, Dana Mangess, said she attributed this statement to a
grieving parent. Â He was heard telling
another CPS supervisor there was no foul play involved and that God does not
make mistakes.Â  Later in the day, Louis
consented to a search of the home and cooperated with police.Â  Two officers did remark they thought Louis had
exhibited nervousness when they examined a belt found at the residence.[3]Â  In the days after the death, Louis remarked
to a co-worker that he had spanked the child and asked the co-worker, Â[Y]ou
donÂt think that killed him?ÂÂ  

Â Â Â Â Â Â Â Â Â Â Â  CPS
investigators and case agents arrived at the hospital. Â In following the agencyÂs protocol when there
has been a childÂs death in a home, they removed the remaining children to
foster care. Â They discovered that Beth
was in significant pain in her buttocks area; due to that pain, she could not
sit, even to use the toilet. Â When CPS
agents transported her to a foster family, great care had to be taken to allow
the child to be able to sit in the car seat.Â 
En route to the foster family in the Dallas/Fort Worth area, the CPS
agents were concerned about BethÂs condition and stopped at a hospital in the
Dallas area, where the child was admitted for treatment and diagnosed with
rhabdomyolysis (severe injury to her muscle cells).

Â Â Â Â Â Â Â Â Â Â Â  On
the day of the childÂs death, Detective Terry Bee of the Bonham Police
Department viewed the forensic interview given by Meg to CPS
investigators.Â  To that point, Bee said
he had believed the cause of death was some form of poisoning or accident,
based on statements made by Cuba and Louis and what Bee had seen at the family
home. Â After watching MegÂs interview,
and based on statements made by her, Bee began to consider that TeddyÂs death
could have been caused by something other than poisoning.Â  The following afternoon (Sunday), Bee
received a telephone call from the medical examinerÂs (M.E.) office.Â  In short, the M.E.Âs report indicated that
Teddy had died from blunt force trauma, including extensive subcutaneous
hemorrhaging in the buttocks and upper thigh regions, among other injuries.Â  Based on this report, Bee changed the thrust
of his investigation to determine whether the death was a homicide.Â  On Monday, MarchÂ 17, 2008, arrest
warrants were secured for Louis and Cuba.Â 
Louis, not yet having been arrested, agreed to give a statement to Bee
and Texas Ranger Brad Oliver. Â Sometime,
apparently before this interview, Louis and Cuba made contact with Justice of
the Peace Joe Dale, who had ordered an autopsy.Â 
Louis asked Dale whether Dale had ever heard of a spanking killing a
child. 

Â Â Â Â Â Â Â Â Â Â Â  Also
on Monday morning, Louis spoke to Bonham Police Officer James Boatman, who had
been present at the Louis home on Saturday morning (the day of death). Â Louis related to him that Louis had seen or
been informed of a preliminary autopsy report and he asked Boatman if Âfoul
playÂ was being considered in regard to TeddyÂs death. Â At that time, Louis told Boatman that he Âhad
to spank the child and he felt like deep in his heart he didnÂt do anything
wrong at that time.Â

Â Â Â Â Â Â Â Â Â Â Â  Shortly
after this, Louis (still not under arrest or in custody) agreed to accompany
Bee and Oliver to the Fannin County SheriffÂs Office for an interview.Â  In the video-recorded interview, admitted at
trial and played for the jury, Bee asked Louis if it was possible that Louis
had struck Teddy harder than he intended.Â 
He explained that the significant internal bleeding could not have been
caused by the simple ÂspankingÂ or ÂwhoppingÂ Louis claimed to have
administered. Â Louis nevertheless
steadfastly maintained that the blows he administered were insufficient to have
caused the massive injuries and he suggested alternatively that the child could
have fallen in the bathroom. Â Louis
attempted to demonstrate how hard he spanked Teddy and Beth by hitting the desk
in the office where he was being interviewed.Â 
Louis said that Beth cried during her spanking, but Teddy Âtook it like
a champÂ and did not cry.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Joni
McClain, deputy chief M.E. from Dallas County, performed an autopsy.Â  McClain said her opinion on the cause of the
childÂs death was Â[h]omicidal violence including blunt-force trauma.ÂÂ Â  

Â Â Â Â Â Â Â Â Â Â Â  ÂHomicidal
violence means the actions of another person caused the death of an individual.Â
Â When asked if she could pinpoint exactly
which injury caused TeddyÂs death, she said, ÂNo, I canÂt just take one of
those bruises out.Â  I have to do
everything in totality.Â  So itÂs all of
the various bruises combined, because youÂre losing blood into the soft tissue.ÂÂ  She said that the term Âhomicidal violenceÂ
is used to include the possibility of asphyxia or lack of oxygen; McClainÂs
opinion on cause of death took into consideration the report given her by
investigators that the child had been hung in a closet:

IÂd had a history that the child was being hung by
its wrists in a closet.Â  So, that would -
- you know, after a while, it gets hard to breathe if youÂre hanging
there.Â  So, thatÂs the reason I went
ahead and included that [asphyxia] along with theÂ  blunt-force injuries.Â  So, that includes homicidal violence.Â  At autopsy, you may not see anything with a
suffocation or asphyxia.Â  But as youÂre
losing blood, blood is the thing that carries oxygen to the brain.Â  So, heÂs losing blood, and itÂs harder to
breathe if youÂre hanging. Â So, all of
that together is the reason I called it homicidal violence including
blunt-force injuries.

Â 

McClain said it was possible that
the child could have bled to death from the injuries.Â  In answering a question about progressive suffocation, McClain said, Â[Y]ou see all that blood
thatÂs going into the soft tissue.Â  And
so, blood is whatÂs carrying oxygen.Â  So,
youÂre getting less blood that you can pump around.ÂÂ  Later, the following exchange occurred:

Â Â Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â Â Â  . . . . Is it possible to estimate the
amount of blood that was lost in [TeddyÂs] buttocks and lower legs ?Â Â  

Â 

Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  Just extensive.Â  No, itÂs just all in the other tissue.

Â 

Â Â Â Â Â Â Â Â Â Â Â  Q.Â Â Â Â Â Â Â  You canÂt pull it out of the fat.Â Â  

Â 

Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  No.Â 


Â 

Â Â Â Â Â Â Â Â Â Â Â  Teddy
had six injuries to his head: Â some
bruises and some scrapes.Â  There were two
impact points on the head corresponding with a subdural hematoma[4]
(bleeding between the brain and the dura, a fibrous covering over the brain,
beneath the skull), resulting in a small amountÂÂ2Â millilitersÂÂof blood
in or on the brain.Â  McClain said there
was not supposed to be blood on the brain.Â 
The boy had bruises on his wrists and one bruise on his lower left
abdomen.Â  An unexplained anomaly not
explored at trial was that the child had a blood-alcohol content of .06 percent
and the vitreous fluid in his eyes contained .08 percent alcohol.Â  No drugs were detected in the childÂs system.
Â He had bruises and scrapes on his
buttocks and on the backs of his legs, together with similar injuries on his
back, all being consistent with having been hit with a belt.Â  McClain described the pattern marks on TeddyÂs
back as Âlike a railroad track.Â Â There
was extensive hemorrhaging in the buttocks and backs of the legs, along with
two small scrapes on the penis. Â Although
she acknowledged the child could have suffocated by being hung by his wrists, a
situation which could affect his ability to breathe, she would not specifically
say whether the final cause of death was due to asphyxiation or to any particular
contusion or injury. Â Rather, she looked
at the totality of TeddyÂs injuries and concluded all of them, in toto, amounted to homicidal
violence.Â  McClain did say that the
extensive hemorrhaging at the buttocks and backs of the legs was more severe
than the brain injury.Â  

II.Â Â Â Â Â Â Â  Sufficiency of Evidence

Â Â Â Â Â Â Â Â Â Â Â  Louis
attacks the sufficiency of the evidence in three primary points of error: Â (1) in point one, that the evidence is legally
insufficient to support the verdict; (2) in point three, that the evidence is
legally insufficient to prove he had the requisite mental state necessary to be
found guilty of capital murder; and finally, (3) in point four, that the
evidence is factually insufficient to support the verdict.[5]Â  Because analysis of the sufficiency of the
evidence of LouisÂ mens rea is a
necessary part of analyzing the sufficiency of the evidence to support the
verdict, we will address these points together.

Â Â Â Â Â Â Â Â Â Â Â  We
begin with LouisÂ third point of error, in which he claims the evidence was
legally insufficient to prove he had the requisite mens rea to be convicted of capital murder.Â  In reviewing the evidence for sufficiency, we
consider the evidence in the light most favorable to the verdict to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.Â  Jackson, 443 U.S. at 318Â19; Brooks, 2010 WL 3894613, at **1, 14.Â  

Â Â Â Â Â Â Â Â Â Â Â  Louis
was indicted for intentionally or knowingly causing the death of a person who
was under the age of six.Â  Tex. Penal Code Ann. Â§ 19.03(a)(8)
(Vernon Supp. 2010).Â  ÂCapital murder is
a result-of-conduct oriented offense; the crime is defined in terms of oneÂs
objective to produce, or a substantial certainty of producing, a specified
result, i.e. the death of the named decedent.ÂÂ 
Roberts v. State, 273 S.W.3d
322, 329 (Tex. Crim. App. 2008) (citations omitted).Â  Due process requires the State to prove
beyond a reasonable doubt every fact necessary to constitute the offense
alleged.Â  Id. (citing In re Winship,
397 U.S. 358, 364 (1970)).Â  Under a hypothetically-correct
jury charge, the State had the burden to prove that Louis intentionally or
knowingly caused the death of Teddy, a child younger than six, by beating him.[6]Â  

Â Â Â Â Â Â Â Â Â Â Â  No
evidence was presented that Louis ever held the intention to kill Teddy.Â  Louis told police he was spanking the
children as punishment for their having made a mess in the house; CubaÂs version
of events corroborated this. Â There is
nothing in the testimony of the other two child witnesses (who were likewise
present when the beatings took place) to suggest that Louis was engaged in
anything more than disciplining the children, albeit to an excessive, horrific,
and cruel degree.Â  Cf. Yost v. State, 222
S.W.3d 865 (Tex. App.ÂÂHouston [14th Dist.] 2007, pet. refÂd) (evidence
defendant regularly beat victim and made statements that he would kill
her).Â  Even the police, when questioning
Louis, seemed of the opinion that Louis was attempting to discipline the
children and did not realize how hard he was hitting them.Â  Detective Bee said that when he questioned
Louis, Bee did not think that Louis intended to cause TeddyÂs death and that
Bee believed the death was accidental.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  A
more complex issue in this case is whether there was sufficient evidence to
support a finding that Louis ÂknowinglyÂ caused TeddyÂs death.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  (b)
A person acts knowingly, or with knowledge, with respect to the nature of his
conduct or to circumstances surrounding his conduct when he is aware of the
nature of his conduct or that the circumstances exist. Â A person acts knowingly, or with knowledge,
with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.

Â 

Tex.
Penal Code Ann. Â§ 6.03 (Vernon 2003).Â 
Proof of a culpable mental state is often made by circumstantial
evidence. Â Dunn v. State, 13 S.W.3d 95, 98Â99 (Tex. App.ÂÂTexarkana 2000, no
pet.).Â  Proof of knowledge is an inference
that may be drawn by the fact-finder both from direct evidence and from
evidence of the circumstances surrounding the act. Â Dillon v.
State, 574 S.W.2d 92, 94Â95 (Tex. Crim. App. [Panel Op.] 1978).Â  A jury may infer intent or knowledge from any
facts which tend to prove its existence, including the acts, words, conduct of
the accused, and the method of committing the crime. Â Hart v.
State, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).Â  ÂIndeed, mental culpability is of such a
nature that it generally must be inferred from the circumstances under which a
prohibited act or admission occurs.Â Â Smith v. State, 965 S.W.2d 509, 518
(Tex. Crim. App. 1998); see also Manrique v. State, 994 S.W.2d 640, 649
(Tex. Crim. App. 1999) (Meyers, J., concurring).Â  Intent can be inferred from the extent of the
injuries to the victim, the method used to produce the injuries, and the
relative size and strength of the parties. Â Patrick
v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).Â  In a murder case, evidence of a particularly
brutal or ferocious mechanism of death, inflicted upon a helpless victim, can
be controlling upon the issue of intent or knowledge. Â Id. Â Additionally, a culpable mental state can be
inferred from the acts, words, and conduct of the accused. Â Id. 

Â Â Â Â Â Â Â Â Â Â Â  As
with the above discussion on the absence of any evidence Louis intended to kill
Teddy, we find no evidence Louis was aware that his conduct (i.e., spankingÂÂor,
more accuratelyÂÂbeating Teddy) was reasonably certain to cause TeddyÂs death. Â See Tex. Penal Code Ann. Â§ 6.03(b).Â  All of the evidence pointed to Louis and Cuba
doing what they did with the intent to discipline the children, but not
attempting to kill them or to engage in conduct they knew was reasonably
certain to kill them.Â  Again, we point to
LouisÂ statements to police that he was disciplining the children and his
denials that he hit Teddy with sufficient force or placement to cause the childÂs
injuries.Â  The fact that Louis expressed
an intention to resume the ÂdisciplineÂ when he got home from work indicates
that he believed the child would be alive when he returned; he told Cuba to
keep the children facing the wall in the hallway when he left.Â  Cuba testified she thought LouisÂ ÂspankingÂ
was what a normal parent would do.Â  She
told police Louis Âspanked them like he always do [sic],Â indicating that this
was, unfortunately, the normal disciplinary process in the home. 

Â Â Â Â Â Â Â Â Â Â Â  Obviously,
we are aware of our duty to defer to the juryÂs determination of the weight and
credibility to be accorded the witnesses and the evidence; we are further
cognizant that evidence of LouisÂ knowledge could be inferred from his acts and
statements.Â  However, this is where we
find the absence of evidence most telling.Â 
From the descriptions of the events of that terrifying morning, it is
clear that Louis and Cuba were anything but ideal parents and should not have
been in the position of enjoying the joys and bearing the responsibilities of
child-rearing.Â  As sad as it is to
contemplate, we must take note of CubaÂs statement that during this episode,
she believed that Louis was simply engaging in an act of normal child
discipline.Â  Obviously, although the
brutality and severity of the childÂs wounds must be considered, that still
does not yield an inference that Louis was reasonably certain death would
result from his conduct.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  We
contrast the instant circumstances with those addressed in Duren v. State, 87 S.W.3d 719 (Tex. App.ÂÂTexarkana 2002, no
pet.).Â  Duren was convicted of capital
murder for having killed a young child who had been left in his charge. Â Duren gave inconsistent explanations of the
cause of the childÂs injuries and ultimately claimed that he was mimicking a
wrestling move and accidentally threw the child to the ground when he meant to
throw the child to a padded chair.Â  There
were no witnesses to the incident. Â Evidence
was presented that Duren had previously argued with and slapped the childÂs
mother, and had a disagreement with her shortly before the child was injured. Â There was testimony from medical doctors that
the childÂs injuries (which included blunt force head trauma and injuries along
the spine, upper arms, and buttocks) could not have been sustained in the
manner described by Duren.Â  Id. at 724Â25.

Â Â Â Â Â Â Â Â Â Â Â  In
Montgomery v. State, 198 S.W.3d 67,
84 (Tex. App.ÂÂFort Worth 2006, pet. refÂd), the Fort Worth court found
sufficient evidence to support MontgomeryÂs capital murder conviction where
Montgomery gave inconsistent stories about the means by which the childÂs
injuries were sustained.Â  There was
evidence the child was injured while in the sole care of Montgomery and,
importantly, a medical doctor testified that the childÂs head injuries were so
significant that the person administering the wounds would have been reasonably
certain the injuries would cause death.Â  Id. at 87.Â  Also taking into consideration MontgomeryÂs
relative size and strength as a college football player versus the size of the
sixteen-month-old victim, the appellate court found sufficient evidence that
Montgomery knew his acts would cause death.Â 
Id. at 87Â88.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
contrast, Louis and Cuba both had charge of the children here, and there is
evidence that Cuba continued the abuse of Teddy after Louis left for work.Â  In addition, other than initially lying about
hitting the children with a belt, Louis eventually admitted using the belt but
maintained he did not hit the children with sufficient force to cause the sustained
injuries.Â  Cuba testified that she
believed that Louis spanked the children that Saturday morning just as any
other Ânormal parentÂ would.Â  When
describing that morningÂs events, it was clear from CubaÂs testimony that the ÂdisciplineÂ
meted out was customary in that household when she said that she told Louis to Âget
up and getÂ the kids while she performed the perfunctory task of cleaning the
mess.Â  This, in her words, Âwas nothing
new.ÂÂ  Louis got his belt, which he did
not do if he were not going to whip the children.Â  This was apparently nothing extraordinary for
this household.Â  ÂTo be aware that his
conduct is reasonably certain to result in death, the actor must also be aware
of the lethal nature of his conduct.Â Â Medina v. State, 7 S.W.3d 633, 640 (Tex.
Crim. App. 1999). 

Â Â Â Â Â Â Â Â Â Â Â  In
sum, there is simply no evidence that Louis knowingly killed Teddy, as ÂknowinglyÂ
is defined in the Texas Penal Code.Â  We
sustain LouisÂ third point of error and render an acquittal for the crime of
capital murder.[7]

Â Â Â Â Â Â Â Â Â Â Â  The
foregoing discussion and conclusion regarding insufficient evidence to support
the verdict for intentionally or knowingly causing TeddyÂs death render moot
LouisÂ points of error claiming more generally of legal and factual
insufficiency of the evidence, so we need not address them.[8]

III.Â Â Â Â Â Â  Claims of Error in the
Jury Charge

Â Â Â Â Â Â Â Â Â Â Â  Louis
makes two claims of error in the charge to the jury. Â He first claims the trial court erred by
inclusion of the following instruction in the jury charge: Â ÂIntent or knowledge may be inferred by acts
done or words spoken.ÂÂ  Next, he claims
the trial court should have granted LouisÂ request to instruct the jury on the
defense of mistake of fact.Â  

Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  Inferred Intent

Â Â Â Â Â Â Â Â Â Â Â  In reference to the language in the
charge concerning inferred intent, the Texas Court of Criminal Appeals has said
inclusion of such language is an impermissible comment on the weight of the
evidence and is, therefore, error. Â Brown v. State, 122 S.W.3d 794, 800Â01 (Tex.
Crim. App. 2003).Â  It was observed that
the Âinstruction marginally falls on the wrong side of the Âimproper-
judicial-commentÂ scale because it is simply unnecessary and fails to clarify
the law for the jury.ÂÂ  Id. at 802.Â  Brown lodged an objection to the inclusion of
this language.Â  Applying the test
announced in Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on rehÂg), the Texas Court of
Criminal Appeals found the error in the case before it was not calculated to
injure the defendantÂs rights, stating that the Âinstruction is mild, neutral,
and an obvious common-sense proposition.ÂÂ 
Brown, 122 S.W.3d at 803.Â  

Â Â Â Â Â Â Â Â Â Â Â  Because
Louis objected to the charge language, we will reverse if we find harm, taking
into consideration all the evidence, the entire jury charge, and the partiesÂ
arguments.Â  Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986); Almanza, 686 S.W.2d at 174; Durden v. State, 290 S.W.3d 413, 420
(Tex. App.ÂÂTexarkana 2009, no pet.). Â One
must take into account that when charge error was preserved at trial by a
timely and specific objection, that error must have been Âcalculated to injure
the rights of [the] defendant.Â Â Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon
2006); Almanza, 686 S.W.2d at 171. Â In other words, a defendant must have suffered
ÂsomeÂ actual (rather than theoretical) harm from the error. Â Almanza,
686 S.W.2d at 171.Â  If this usually
relatively benign error were to be taken alone, we might be inclined to find
this error Âmild, neutral, and an obvious common-sense proposition.ÂÂ  Brown,
122 S.W.3d at 803.Â  However, because
LouisÂ primary defense relied upon the position that he did not know that his ÂspankingsÂ
were sufficiently severe to result in the childÂs serious bodily injury or
death, we consider this issue of preserved-charge error conjunctively with
LouisÂ point of error complaining of the trial courtÂs denying Louis an
instruction on mistake of fact.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  B.Â Â Â Â Â Â Â  Mistake of Fact 

Â Â Â Â Â Â Â Â Â Â Â  The
trial court denied LouisÂ request for a jury instruction on mistake of fact. Â ÂIt is a defense to prosecution that the actor
through mistake formed a reasonable belief about a matter of fact if his
mistaken belief negated the kind of culpability required for commission of the
offense.Â Tex. Penal Code Ann. Â§
8.02(a) (Vernon 2003).Â  A defendant is
entitled to an affirmative defensive instruction on every issue raised by the
evidence regardless of whether the evidence raising the issue is strong, weak,
unimpeached, contradicted, or unbelievable. Â Muniz v.
State, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).Â  Generally, an instruction on the mistake of
fact defense should be given when evidence raising the issue of whether the
actor formed a reasonable belief about a matter of fact, if his mistaken belief
negated the kind of culpability required for the commission of the offense. Â Samford
v. State, 302 S.W.3d 552, 556 (Tex. App.ÂÂTexarkana 2009, no pet.).

Â Â Â Â Â Â Â Â Â Â Â  In
Thompson v. State, 236 S.W.3d 787
(Tex. Crim. App. 2007), the defendant was charged with intentionally or
knowingly causing serious bodily injury to a child, a first-degree felony, and
also with intentionally or knowingly causing bodily injury to a child, a
third-degree felony.Â  In that case,
Thompson had beaten a student in his Bible study class with a tree branch,
thereby causing significant injuries. Â The
case hinged on a finding that the doctrine of transferred intent could apply to
transfer of intent from a lesser offense to a greater offense.Â  ThompsonÂs intent to cause bodily injury was
found to transfer to his having caused serious bodily injury. Â Id.
at 800. Â The Texas Court of Criminal
Appeals also stated that mistake of fact could have been raised under those
circumstances and that although Thompson did not request a mistake of fact
instruction, he would have been entitled to such an instruction had he done
so.Â  Id.Â  Whether a defendantÂs mistaken belief is
reasonable is a matter for the jury or trier of fact to determine.Â  Granger
v. State, 3 S.W.3d 36, 38Â39 (Tex. Crim. App. 1999).

Â Â Â Â Â Â Â Â Â Â Â  In
the charge given to LouisÂ jury, the following sentence is repeated eight times
(first in the portion of the charge for capital murder and again on each of the
lesser-included offense charges):Â  ÂA
person is nevertheless criminally responsible for causing a result if the only
difference between what actually occurred and what he desired, contemplated, or
risked is that a different offense was committed.Â Â We construe this as being a transferred intent
instruction as codified in Section 6.04(b)(1) of the Texas Penal Code.Â  Tex.
Penal Code Ann. Â§ 6.04(b)(1) (Vernon 2003). 

Â Â Â Â Â Â Â Â Â Â Â  Thompson is very similar to LouisÂ
situation.Â  Like Thompson, LouisÂ defense
was that he intended to discipline the child, an action which would clearly
entail bodily injury as defined by statute.Â 
Although at first blush the facts of this case would not seem to support
the normal mistake of fact situation,[9] in
light of Thompson, we find Louis was
entitled to the mistake of fact instructionÂÂwhich he requested but was denied
at trial.Â  We must reverse if we find Âsome
harmÂ to LouisÂ rights.Â  Ngo v. State, 175 S.W.3d 738, 743 (Tex.
Crim. App. 2005); Almanza, 686 S.W.2d
at 171.Â  As discussed above, we review
all the evidence at trial, the charge as a whole, and the argument of
parties.Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Louis
constructed his defense on two main pillars: Â (1) that Cuba might have killed the child
after he left the house and (2) that he only intended to discipline the
children, not to cause the death of either. Â In relation to the second of these defenses,
as discussed above, Louis admitted to investigators that he had struck the
child as a means of discipline, but maintained he had not struck the child with
sufficient force to produce the resulting injuries.Â  There was testimony from Cuba that she
thought LouisÂ beating constituted normal parental disciplining. Â Louis made comments at the hospital such as, ÂGod
knows we didnÂt do nothing [sic] wrongÂ and was tearful.Â  He asked two people, including Justice of the
Peace Dale, whether it was possible for a spanking to result in a childÂs
death.Â  While it is true that some of
this conduct or statements could be construed as suspicious or self-serving, we
are concerned here with a review of all the trial evidence in assaying harm,
not in a sufficiency review where we would be looking at the evidence in the
light most favorable to the verdict.

Â Â Â Â Â Â Â Â Â Â Â  We
also look at the charge as a whole in considering any harm to Louis.Â  As pointed out above, there was error in
instructing the jury it could infer intent from acts or words spoken.Â  We find this error (which would usually be
not harmful) is exacerbated by the erroneous denial of the mistake of fact
instruction.Â  Both errors center upon a
major part of LouisÂ defenseÂÂthat he did not intend to cause death or serious
bodily injury or know that his actions were reasonably certain to cause those
results. Â The charge also provided for
several lesser-included offenses: Â injury
to a child by intentionally or knowingly causing serious bodily injury;
manslaughter; injury to a child by recklessly causing serious bodily injury;
injury to a child by intentionally or knowingly causing bodily injury; injury
to a child by recklessly causing bodily injury; criminally negligent homicide;
and injury to a child by causing bodily injury by criminal negligence.[10]Â  LouisÂ requested instruction on mistake of
fact would have instructed the jury that if it believed Louis Âthrough mistake
formed a reasonable belief that the spanking that he administered to [Teddy]
was not to the extent to cause serious bodily injury or bodily injury or death
. . . or, if you have a reasonable doubt thereof, then you will find the
defendant not guilty.ÂÂ  LouisÂ two-fold
defense hinged on (a)Â placing the blame for TeddyÂs death on Cuba, and (b)
arguing he did not have the requisite mental status to be held responsible for
the childÂs death. 

Â Â Â Â Â Â Â Â Â Â Â  As
regards the partiesÂ argument, the State made some brief references to whether
the evidence proved that Louis knew his actions would cause TeddyÂs death.Â  The State argued, ÂIt wasnÂt in his heart to
kill that baby.Â  It wasnÂt.Â  But he was pissed and he took that belt and
he beat that two-year-old . . . .ÂÂ  The
State stressed the amount of the beatings and that they took place over a span
of time in more than one session.Â  It
further suggested that Louis raced home from work upon receiving word the child
was not breathing in order to hide the belt and other evidence.Â  The State concluded both sections of its
closing arguments by saying that Louis Âknew he went overboard [with the
beatings].Â  He knew he did too muchÂ and
that Louis had gone Âtoo far.ÂÂ  LouisÂ
closing argument reiterated his belief that the children were alive and that he
believed them to be relatively well (or at least not at risk of death) when he
left them and that the responsibility for the serious bodily injury and death
lay at CubaÂs feet.Â  Counsel argued that
LouisÂ conduct, such as racing home and comments made at the hospital, were
consistent with an innocent mind, because when he left home, the children were
alive.Â  Defense counsel cited LouisÂ
statements, while alone, caught on the video of his second interview, where he
prayed that God would let the police see what really happened, as evidence of
his innocent mind.Â  

Â Â Â Â Â Â Â Â Â Â Â  In
this case, LouisÂ mental state was a hotly contested issue.Â  The failure to instruct the jury on the
defense of mistake of fact was an impediment to LouisÂ ability to present his
defense that he did not have the requisite mens
rea to be found guilty and to argue that defense to the jury.Â  See
Palmer v. State, 222 S.W.3d 92, 96
(Tex. App.ÂÂHouston [14th Dist.] 2006, no pet.) (defendant impeached
complainant with evidence she had made a false accusation against a third
party; trial court charge erroneously instructed that the jury could only
consider the false accusation if it found the accusation false beyond a
reasonable doubt; effectively deprived defendant of impeachment evidence,
resulting in egregious harm); Hinojosa v.
State, 744 S.W.2d 319, 322Â23 (Tex. App.ÂÂCorpus Christi 1988, pet. refÂd)
(where defendant entitled to self-defense instruction, denial of instruction
harmful).

Â Â Â Â Â Â Â Â Â Â Â  Reviewing
the evidence, the charge, and the arguments of counsel, we cannot say that the
charge errors here did not cause some harm to Louis.Â  Â[T]he presence of any harm, regardless of
degree, which results from preserved charging error, is sufficient to require
reversal of the conviction.Â Â Arline, 721 S.W.2d at 351.Â  The jury was effectively denied the
opportunity to consider LouisÂ most potent defenseÂÂthat he did not know the
degree of injury he was inflicting. Â While this defense may not seem reasonable to
us, resolution of that reasonableness is a matter for the jury.Â  Granger,
3 S.W.3d at 38Â39.Â  Finding that Louis
did suffer some harm, we are compelled to sustain his eighth point of error and
remand this case for a new trial.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  There
are various lesser-included offenses to the primary charge which involve the
application of LouisÂ mens rea in a
greater or lesser degree.Â  It is the
province of the jury, after proper instruction, to determine the reasonableness
of LouisÂ mindset when inflicting the damages to the child.

Â Â Â Â Â Â Â Â Â Â Â  There
are other issues raised by Louis on appeal (e.g., the presence of an
investigator/witness in the courtroom during a portion of the trial after
imposition of Âthe ruleÂ pursuant to Rule 614,[11]
the alleged lack of corroboration of the testimony of Cuba as an accomplice,
the refusal of the trial court to allow cross-examination of Cuba concerning
her sexual liaison with a jailer while incarcerated after the childÂs death),
which do not present reversible error under the circumstances of this case as
it was tried.Â  However, because the
matters discussed above are dispositive of this case, we do not choose to delve
deeply into a discussion of them.

Â Â Â Â Â Â Â Â Â Â Â  We
reverse the conviction of Louis for capital murder and render an acquittal of
that offense. Â We remand this case to the
trial court for a trial of the lesser-included offenses.

Â 

Â 

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  October
6, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  December
15, 2010

Â 

Publish

Â 











[1]All
childrenÂs names in this opinion have been replaced with pseudonyms.Â Â  





[2]Pediatrician
Matthew Cox, M.D., testified rhabdomyolysis results from injury to muscle
cells.Â  In BethÂs case, she had soft
tissue injuries to her buttocks and back; the injuries resulted in elevated
enzyme levels in her muscle cells.Â  The
enzyme levels in BethÂs muscle cells were four times the normal level.Â  Cox said this condition presented a
substantial risk of death.Â  Medical
examiner McClain said that Teddy did not exhibit rhabdomyolysis because he died
too soon; had he lived longer, he likely would have exhibited
rhabdomyolysis.Â Â  





[3]The
record here is not entirely clear:Â  Cuba
testified the belt was broken in the beatings; the crime laboratory forensic
scientist testified the belt she examined was Âbroken in half.Â  But neither of the police officers who
described searching the home and finding the belt described the belt as
broken.Â  There were at least two belts
discussed and admitted at trial, neither of which was included in the appellate
record.Â  Adding to the confusion, two
belts were crossed up, either when submitted by Bonham police or when examined
at the crime laboratoryÂÂwhen Detective Bee opened the evidence envelope
containing one of the belts, sealed since its examination at the crime
laboratory, he removed a green robe belt, expecting a black robe belt.Â  One or both of these may have been used to
hang Teddy in the closet.Â  The testimony
seems to indicate Louis beat the children with a brown leather belt.Â  Although Louis attacked the competency of the
investigation throughout trial, we do not find the details of which belt was
used or its condition especially germane to resolution of this appeal.Â  Louis admitted beating the children with a
belt; he claimed to be the only person who disciplined the children, and which
belt caused the injuries to Teddy is not as important as LouisÂ mental status,
as will be discussed below.Â Â  





[4]McClain
explained the structure as, Â[Y]ouÂve got skull, then youÂve got dura, and then
youÂve got brain.Â 





[5]In
Brooks v. State, No. PD-0210-09, 2010 WL 3894613, at **1, 14 (Tex. Crim.
App. Oct. 6, 2010) (a 4-1-4 decision with one judge joining the lead opinion
with a concurring opinion and another concurring with the lead opinion and
joining that concurrence), a plurality of the Texas Court of Criminal Appeals
abolished the factual sufficiency review established by Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996), and its progeny.Â  The
plurality and the concurring judges agreed that the Jackson v. Virginia, 443 U.S. 307 (1979), legal sufficiency
standard is the sole standard that a reviewing court should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable
doubt.Â  Brooks,
2010 WL 3894613, at **1, 14.Â  Since the Texas Court of Criminal Appeals
has abolished factual sufficiency review, we need not address the defendantÂs
challenge to the factual sufficiency of the evidence.





[6]We
weigh the sufficiency of the evidence by considering elements of the offense as
defined by a hypothetically-correct jury charge. Â Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).Â  The hypothetically-correct jury charge Âsets
out the law, is authorized by the indictment, does not unnecessarily increase
the StateÂs burden of proof or unnecessarily restrict the StateÂs theories of
liability, and adequately describes the particular offense for which the
defendant was tried.Â Â Id.Â 






[7]Because
the jury was instructed on lesser-included offenses, we would normally at this
point proceed to examine whether the evidence supports judgment on one of those
offenses.Â  Herrin v. State, 125 S.W.3d 436, 443Â45 (Tex. Crim. App.
2002).Â  But because we find harmful jury
error in the next part of our analysis, we will not consider the lesser
offenses.Â  Rather, we will remand for a
new trial. 

Â 





[8]As
for the claim of factual insufficiency, we would not address that claim in
light of the Texas Court of Criminal AppealsÂ ruling in Brooks, 2010 WL 3894613, at **1, 14.Â  See footnote 5, supra.





[9]For
example:Â  Granger, 3 S.W.3d at 38 (defendant entitled to mistake of fact
instruction where evidence raised defensive theory he thought car was unoccupied
when he fired into it with pistol); Sands
v. State, 64 S.W.3d 488, 493 (Tex. App.ÂÂTexarkana 2001, no pet.) (defendant
entitled to instruction where he testified he thought syringe of
methamphetamine contained vitamin B-12).





[10]Louis
objected to inclusion of these lesser-included offenses.Â  





[11]Tex. R. Evid. 614.